OPINION OF THE COURT
Rolando T. Acosta, J.
Summary
Plaintiff sued Bates Advertising Holdings, Inc. for employment discrimination under both the New York State and New York City Human Rights laws. She claimed that she was denied a position because of her gender and perceived disability, and that she was ultimately terminated because of the perceived disability. Defendant asserted that plaintiff was terminated for economic reasons and because a major client had complained about her work. After a jury trial over a three-week period, the jury found that plaintiff had been terminated because she was perceived to be disabled and awarded her $2,000,000 in compensatory damages and an additional $500,000 in punitive damages. Defendant subsequently moved for judgment notwithstanding the verdict, a new trial or remittitur on damages, and plaintiff cross-moved for attorney’s fees.
Background
In September 1993, plaintiff, who had been diagnosed with multiple sclerosis (MS) a year earlier, was approached by a headhunter about a possible consulting position with AC&R Advertising, Inc., a division of Bates Advertising Holdings. The position entailed providing account planning services to Foot Locker, one of Bates’s clients. Plaintiff was interviewed for the position by Douglas Fidoten, the executive vice-president (EVP) *766 responsible for the Foot Locker account. According to plaintiff, during the interview, Fidoten asked her about her use of a cane (she used a cane as a result of her MS). Fearful of disclosing her disability, she answered that she had hurt her leg in a skiing accident. Plaintiff was hired as a consultant that October.
Several months later, in December 1993, the headhunter approached plaintiff again about a full-time head of planning position with AC&R. She was interviewed by Steven Bennett (AC&R’s then president) and Harry Koenig (AC&R’s chief financial officer [CFO]). As in the interview with Fidoten, plaintiff testified that both Bennett and Koenig inquired about her use of a cane. Again, she answered that she hurt herself skiing.
Plaintiff was hired and commenced her employment on January 4, 1994. Although she was to be hired as an EVP of account planning, initially she would be given the title of senior vice-president to avoid offending tenured EVPs. Her base salary was $125,000 plus a formulaic bonus for new business and consulting projects. Within a month, she was given the title of EVE According to plaintiff, it was her understanding, based on her conversations with Bennett and Koenig that after being appointed to EVP her salary would be consistent with the title of EVP Arthur D’Angelo, Bates USA’s CFO, testified that EVPs were paid between $150,000 and $300,000 per year in 1994, exclusive of bonuses and other benefits. Fidoten, an AC&R EVP was paid $250,000. Plaintiff never received any raises or any other benefits to bring her compensation commensurate with the other EVPs.
Plaintiffs job consisted of providing strategic planning for AC&R’s accounts, which included Foot Locker and Estee Lauder, AC&R’s two biggest clients, as well as a few other smaller clients. Foot Locker had been AC&R’s client for about 5 to 10 years and was described by Bennett as an aggressive client who, based on its work culture and image, wanted its team to be somewhat athletic and youthful.
Before plaintiff could hire the staff she had been promised, she was told by Bennett and Koenig that she would have to “fire [Nancy Israel] the woman with the club foot,” a directive that really scared her. Although plaintiff eventually terminated Israel for performance reasons, she was never allowed to build her department. Instead, within two months of being hired, Bennett began asking her why she still needed the cane. According to plaintiff, this escalated into a campaign by Bennett of *767 regularly “harassing” her about when she would “get rid of the cane” and culminated with his threat that she “better get better soon.”
Ironically, Bennett was not only the president, he was also the chief compliance officer for the equal employment opportunity (EEO) policy. Notwithstanding his position, he admitted that at least on two occasions he heard other individuals in supervisory positions call plaintiff a “cripple,” which he remembered because it personally offended him. Nevertheless, Bennett took no action against the individuals calling plaintiff a “cripple” even though there was an antidiscrimination policy in effect which prohibited discrimination on the basis of disability and which Bennett, as chief compliance officer, was personally responsible for implementing.
In the spring of 1994, Fidoten also began to inquire about plaintiffs continued use of her cane, a claim which Fidoten denied. Indeed, according to plaintiff, during a new business rehearsal in April 1994, Fidoten not only attempted to exclude her from the presentation but also intentionally knocked over her cane, which made a loud banging sound. Fidoten then sat down next to Jennifer Brooke, the creative director, and started laughing and joking. When plaintiff stood to make her presentation, she clearly heard Fidoten say in a sarcastic tone “and we’ve got a cripple,” after which Fidoten and Brooke started laughing. Fidoten also denied this claim, although during his direct testimony he stated that the presentation took place in a carpeted room. When asked by his counsel “what does this have to do with anything?” he responded, “Well, it [the cane] wasn’t rattling around.” Fidoten admitted that during the spring of 1994, he excluded plaintiff from key client meetings.
On June 10, 1994, plaintiff applied for the position of EVP/ director of account planning, a position similar to hers but larger in scope, with Bates USA (AC&R’s parent company) and was interviewed by Arthur D’Angelo (Bates USA’s CFO) and Michael Bungey (Bates Worldwide’s chief executive officer [CEO]). Bungey testified that he found plaintiff qualified for the position and forwarded her name to Frank Assuma (president of Bates USA). Assuma, however, never contacted plaintiff. Instead, the position was given to Jeff DeJoseph, a nondisabled external candidate, even though it was the company’s policy to hire first from within. According to D’Angelo, one of the reasons that plaintiff was not considered for the position related to plaintiffs importance to the Estee Lauder and Foot Locker ac *768 counts. In fact, he asserted, Foot Locker would have found it unsettling if plaintiff had been let go.
In the spring of 1994, AC&R began experiencing financial problems, which led to merger talks between AC&R and Bates USA. Despite her senior planning position and high level client relationship, she was not asked to participate in the merger talks between AC&R and Bates USA. Ultimately, AC&R split into two divisions, Bates Alliance to service Foot Locker and Bates Manhattan to service Estee Lauder, and the two divisions were moved into the building where Bates USA had its offices. The merger took place in August 1994, resulting in layoffs of predominantly “back office” personnel (personnel who did not deal directly with clients). In total, about 55 to 60 of AC&R’s employees were let go, including Koenig and EVP Shelly Marks, two nondisabled men. According to Fidoten (who after the merger became the head of Bates Alliance), D’Angelo recommended that Fidoten terminate plaintiff as part of the layoffs, but Fidoten fought for her job and had her work almost exclusively on the Foot Locker account under his supervision.
Shortly after the merger, sometime in August or September 1994, plaintiff heard that DeJoseph was forming a Planning Department at Bates USA and wanted to meet with him about the possibility of joining the team. According to plaintiff, DeJoseph was dismissive of her, told her that there was no position for her, and ultimately hired Jill Kossoff, a nondisabled female in November. DeJoseph also removed plaintiff from the Estee Lauder account, without explanation, even though she had only received positive feedback from Estee Lauder. Additionally, she was excluded from meetings between Foot Locker and Bates USA.
Plaintiffs role continued to diminish (including Fidoten turning her office into a storage room) until she was terminated on March 10, 1995. Fidoten told her that DeJoseph and Kossoff were working on the Foot Locker account and that she was being terminated for financial reasons. Notwithstanding this reason, the work that plaintiff was performing was now being handled by DeJoseph, Kossoff, Fidoten, and at least three or four other persons, and neither D’Angelo or Fidoten could state that using these other individuals other than plaintiff saved Bates USA any money.
In addition, plaintiff was told that Foot Locker had complained about her suggestions being too complicated and expensive. Plaintiff had never been told of any client complaints nor were *769 there any performance reviews or client audits that might have documented reports of client dissatisfaction. Indeed, Bennett testified that he would consider it a poor business practice and frown upon a supervisor who did not tell an employee that a client had complained about her work. And, even more importantly, Fidoten, plaintiffs supervisor and the person who made the decision to terminate her, admitted that it was his practice to meet with subordinates about client complaints. He never met with her, however, to discuss Foot Locker’s alleged complaint. Significantly, neither Bennett nor DeJoseph were ever advised by Fidoten that a client had complained about plaintiff. Fidoten only told Ann Melanson, head of Human Resources for Bates Worldwide and the EEO compliance officer for the merged company. And even though plaintiff alluded to being discriminated against when she spoke with Nancy Smith, Melanson’s assistant, Melanson, as EEO compliance officer, never took steps to ascertain or confirm that the reasons offered by Fidoten for terminating plaintiff were true.
For the next 4V2 years, plaintiff performed various consulting projects until she obtained permanent employment with Verizon Corp. She worked at Verizon, at a significantly lower salary than she had earned at Bates, until March 2002 when she became totally disabled and began receiving long-term disability benefits. Dr. David Crawford, an expert on damages, testified that plaintiff had suffered a net economic loss of a little over $5,000,000.
Without objections, the court submitted three causes of action pursuant to the New York State Human Rights Law and the New York City Human Rights Law for the jury’s consideration: that plaintiff was denied a position because of her gender; that she was denied a position because she was perceived to be disabled; and that she was terminated because she was perceived to be disabled. The jury found that plaintiff was terminated because she was perceived to be disabled and awarded her $2,000,000 in damages and an additional $500,000 in punitive damages. Defendant then moved pursuant to CPLR 4404 (a) for judgment notwithstanding the verdict, remittitur or a new trial, and plaintiff cross-moved for costs and attorney’s fees pursuant to section 8-502 (f) of the Administrative Code of the City of New York.
Defendant’s Motion for Judgment Notwithstanding the Verdict
Pursuant to CPLR 4404 (a), ££[a]fter a trial of a cause of action . . . the court may set aside a verdict or any judgment *770 entered thereon and direct that judgment be entered in favor of the party entitled to judgment as a matter of law . . . In order to sustain a determination that a jury verdict is not supported by sufficient evidence as a matter of law, there must be “no valid line of reasoning and permissible inferences which could possibly lead rational men [and women] to the conclusion reached by the jury on the basis of the evidence presented at trial.” (Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978]; see also, Randolph v City of New York, 69 NY2d 844, 847 [1987] [that there was evidence to the contrary does not justify dismissing the complaint on the ground that the jury verdict was not based on legally sufficient evidence].) Indeed, the prevailing party is “entitled to the benefit of every favorable inference which can reasonably be drawn from the facts.” (Taype v City of New York, 82 AD2d 648, 651 [2d Dept 1981].)
New York City Human Rights Law (Administrative Code of City of NY) § 8-107 (1) (a) prohibits discrimination based upon a perceived disability in the workplace. Although New York state courts have applied the same standards as federal courts in considering employment discrimination claims (Matter of Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 25-26 [2002]; Walsh v Covenant House, 244 AD2d 214, 215 [1st Dept 1997]), in enacting the more protective Human Rights Law, the New York City Council has exercised a clear policy choice which this court is bound to honor. The Administrative Code’s legislative history clearly contemplates that the New York City Human Rights Law be liberally and independently construed with the aim of making it the most progressive in the nation.[1] Thus, the case law that has developed in interpreting both the state Human Rights Law and title VII of the Civil *771 Rights Act of 1964 should merely serve as a base for the New York City Human Rights Law, not its ceiling. (See also Local Law No. 85 [2005] of City of New York § 1 [Local Civil Rights Restoration Act of 2005]; Council Report of Governmental Affairs Div, Comm on General Welfare, Aug. 17, 2005.) In the present case, although plaintiff has clearly established her claims under the more restrictive state and federal standards, when possible, the court will conduct its analysis under the New York City Human Rights Law.
In the absence of direct evidence of discrimination, claims are evaluated pursuant to the burden shifting framework outlined by the United States Supreme Court in McDonnell Douglas Corp. v Green (411 US 792 [1973]). Thus, a party making such a claim must first make out a prima facie case by demonstrating that she is a member of a protected class, and was discharged or barred from a position for which she was qualified, or paid less in such position, and that this occurred under circumstances giving rise to an inference of discrimination. (Id. at 802.) All that is required at this juncture is a de minimis showing. (Howley v Town of Stratford, 217 F3d 141, 150 [2d Cir 2000].)
Once a prima facie case has been established, a presumption arises that the employer unlawfully discriminated against the plaintiff. (Texas Dept. of Community Affairs v Burdine, 450 US 248, 254-256 [1981].) To rebut the presumption, the employer must submit evidence of legitimate, nondiscriminatory reasons for its adverse actions toward plaintiff. (Id.) If evidence rebuts the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer’s reason was false and that discrimination was the real reason. (Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO, 14 AD3d 325, 339 [1st Dept 2005], citing Ferrante v American Lung Assn., 90 NY2d 623, 630 [1997].)
“The factfinder’s disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant’s proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.” (St. Mary’s Honor Center v Hicks, 509 US 502, 511 [1993].)
*772 Applying these principles to the facts of this case, it becomes abundantly clear that defendant’s motion must be denied. Plaintiff established a prima facie case that she was terminated by defendant because she was perceived to be disabled by showing that perceived disability is a protected class under the New York City Human Rights Law; that defendant perceived her as having a disability; that she was qualified for her position; that she was terminated by defendant; and that the circumstances of her discharge gave rise to an inference of discrimination. Indeed, defendant does not contest that plaintiff made out a prima facie case. Instead, defendant contends that it articulated legitimate, nondiscriminatory reasons for terminating plaintiff, namely, that it did so for economic reasons and because Foot Locker, one of defendant’s customers (whom plaintiff serviced), had complained to defendant that plaintiff’s work was too complex and, occasionally, too expensive, and that plaintiff did not prove by a preponderance of the evidence that the proffered reasons were false and a pretext for discrimination.
It cannot be said on the facts of this case, however, that the jury’s finding that defendant’s reasons for terminating plaintiff were a pretext for discrimination (verdict sheet question No. 19) was not supported by any “valid line of reasoning and permissible inferences.” (Cohen v Hallmark Cards, supra, 45 NY2d at 499.) Indeed, there was extensive and persuasive evidence from which the jury could have made a finding that defendant’s assertion that she was terminated for financial reasons was a pretext for discrimination. Among the most damaging were plaintiffs testimony that she was asked by Bates management about the reason she needed to use a cane (management believed that her use of a cane was temporary); that her salary as an executive vice-president was never made commensurate with that of nondisabled EVPs; that the Foot Locker-Agency combined team was known to be one that promoted youth and athleticism;[2] that after about two months as a permanent employee, president Steve Bennett and CFO *773 Harry Koenig repeatedly “harassed” her about her need to use a cane and told her to “get rid of the cane”; that in April 1994, she was publicly humiliated at a presentation when Fidoten deliberately knocked over her cane with the intent of bringing attention to it and called her a “cripple”; that Bennett confirmed that at least two supervisory persons called plaintiff a “cripple” in his presence and, although he was the EEO compliance officer, he took no action; that employees terminated as a result of the AC&R/Bates merger were back office nonclient personnel; that when the company began to perceive her as disabled, she was excluded from client meetings; that Jill Kossoff, a nondisabled female, told plaintiff that she was replacing her on the Foot Locker account; that Fidoten testified that after plaintiffs termination, the work that plaintiff provided for Foot Locker was provided by over six individuals; and that Fidoten essentially converted plaintiffs office to a storage room so that she could not access her desk.
Likewise, plaintiff offered extensive evidence to establish that defendant’s assertion that her employment was terminated because of a client complaint was a pretext for discrimination. For instance, plaintiff was never advised by Fidoten that Foot Locker complained about her, notwithstanding that it was his practice to discuss client complaints with his subordinates; there was no documentation of the alleged complaint; no negative comments made about plaintiff when CEO Michael Bungey met with Foot Locker to inform it of the merger; neither Bennett nor DeJoseph was ever made aware of Foot Locker’s alleged complaint even though they had supervisory responsibility for plaintiff; and plaintiff was never given a performance review.
Based on the foregoing, defendant has failed to establish that there was no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury. (Cohen v Hallmark Cards, supra, 45 NY2d at 499.) Contrary to defendant’s assertions, Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO (14 AD3d 325 [1st Dept 2005]) does not set the analytical framework here, and even if it did, it does not mandate a different result. In Stephenson (an age discrimination case), defendant provided a legitimate, nondiscriminatory reason for terminating the plaintiffs, namely, that an investigation revealed that they were involved in corruption. Moreover, the defendant established that younger employees were also terminated and older employees were retained. Plaintiff, however, *774 failed to offer evidence to establish that the reason was false and that the real reason was discriminatory:
“In the face of this compelling showing by defendants, it was plaintiffs’ burden to prove by a preponderance of the evidence ‘both that the reason [proffered by defendants] was false, and that discrimination was the real reason’ (Ferrante, 90 NY2d at 630, quoting St. Mary’s Honor Ctr. v Hicks, 509 US 502, 515 [1993]). Plaintiffs failed to carry either prong of this burden of proof. To reiterate, they raised no issue of fact as to the truth of the reason defendants gave for their dismissals, nor did they raise an issue as to the truth of the facts adduced by defendants that were inconsistent with discriminatory intent, i.e., the Trustee’s simultaneous termination of younger employees implicated in the corruption and his retention of older employees who had not been similarly implicated. Plaintiffs did not offer an iota of evidence to create a triable issue as [to] either of these matters.
“In the final analysis, plaintiffs’ case rests entirely on plaintiff Stephenson’s uncorroborated and self-serving testimony that the now-deceased Trustee told him that he was being fired because the union needed ‘new blood.’ Given the uncontradicted evidence of a legitimate reason for dismissal and of objective facts (the ages of other employees fired or retained) negating any inference of discriminatory intent, we conclude that the Trustee’s alleged statement to Stephenson — which, although ambiguous, could be construed to refer to Stephenson’s age— simply does not support the verdict for plaintiffs.” (Id. at 331-332.)
In the present case, as demonstrated above, however, plaintiff presented extensive evidence that both the proffered reason was false and that defendant’s real reason for terminating plaintiff was her perceived disability. Accordingly, defendant’s motion for judgment notwithstanding the verdict is denied.
Defendant’s Motion for a New Trial
As an alternative to judgment notwithstanding the verdict, defendant seeks a new trial pursuant to CPLR 4404 (a) on the grounds that the verdict was against the weight of the evidence and not in the interest of justice. Whether a jury verdict should be set aside as contrary to the weight of the evidence requires a discretionary balancing of many factors, including interest of *775 justice factors (i.e., trial error) (Nicastro v Park, 113 AD2d 129, 133-134 [2d Dept 1985]).
“A preeminent principle of jurisprudence in this area is that the discretionary power to set aside a jury verdict and order a new trial must be exercised with considerable caution, for in the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, not the trial court, and a court must act warily lest overzealous enforcement of its duty to oversee the proper administration of justice leads it to overstep its bounds and ‘unnecessarily interfere with the fact-finding function of the jury to a degree that amounts to an usurpation of the jury’s duty.’ ” (Id. at 133.)
Absent interest of justice factors, the verdict should not be set aside as contrary to the weight of the evidence unless the jury could not have reached the verdict on any fair interpretation of the evidence. (Id. at 133-134; Gafur v Garden Cab Corp., 1 Misc 3d 912[A], 2004 NY Slip Op 50038[U] [Sup Ct, Bronx County 2004].)
To obtain a new trial in the interest of justice,
“[t]he Trial Judge must decide whether substantial justice has been done, whether it is likely that the verdict has been affected . . . and ‘must look to his own common sense, experience and sense of fairness rather than to precedents in arriving at a decision.’ . . . This power conferred upon a court to order a new trial is discretionary in nature.” (Micallef v Miehle Co., Div. of Miehle-Goss Dexter, 39 NY2d 376, 381 [1976] [citations omitted].)
In the present case, defendant argues that the verdict is against the weight of the evidence since its burden of providing a legitimate, nondiscriminatory reason for plaintiffs termination was merely one of production and not of persuasion, and it proffered evidence that plaintiff was terminated for legitimate reasons, the jury’s answer to question 18 in the verdict sheet that defendant failed to proffer a legitimate, nondiscriminatory reason was against the weight of the evidence. The problem with this argument is that in question 19 the jury went on to find that defendant’s reasons for terminating plaintiff were pretextual. Thus, when the jury found that defendant had not proffered legitimate, nondiscriminatory reasons in response to ques *776 tion 18, it was simply finding at that juncture, without turning the page to question 19, that the reasons were not legitimate. In any event, even if this were error, it does not warrant a new trial under the standards discussed above. Defendant’s remaining contentions regarding charging errors[3] and failure to keep out hearsay[4] evidence have no merit and even if they did would not require a new trial.
Defendant’s Motion for Remittitur of Damages
Last, defendant moves pursuant to CPLR 4404 (a) for remittitur of damages on the basis that the $2,000,000 in compensatory damages and $500,000 in punitive damages were not supported by the record. The court disagrees with defendant. Plaintiff presented the testimony of Dr. David Crawford, who testified as an expert on damages. Based on his thorough analysis, Crawford concluded that plaintiff suffered a net economic loss of $5,038,561. Although defendant cross-examined Crawford with a report prepared by its own expert, it never called the expert to testify on the issue of damages. Thus, based on the testimony before the jury, it cannot be said that the amount of damages was not supported by the record.
In addition to compensatory damages, punitive damages are allowed under section 8-502 (a) of the Administrative Code. In analyzing whether to sustain an award of punitive damages under the New York City Human Rights Law, state courts apply the same framework used by the federal courts in actions brought pursuant to title VII of the Civil Rights Act of 1964. (Farias v Instructional Sys., Inc., 259 F3d 91, 101-102 [2d Cir 2001].) That standard was articulated in Kolstad v American Dental Assn. (527 US 526, 529-530 [1999]), where the Court *777 held that “punitive damages [under title VII] are limited ... to cases in which the employer has engaged in intentional discrimination and has done so ‘with malice or reckless indifference to federally protected rights of an aggrieved individual.’ ” According to the Court, “malice and reckless indifference” refer to “the employer’s knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.” (Id. at 535.) As the court held in Hill v Airborne Frgt. Corp. (212 F Supp 2d 59, 76 [ED NY 2002]), it is reasonable for juries to infer that employers have acted in violation of the law “simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory scheme proscribing such conduct, the size of [the employer defendant] and the common knowledge in today’s society that employment discrimination is impermissible.” (See also, Greenbaum v Svenska Handelsbanken, NY, 67 F Supp 2d 228, 262 [SD NY 1999] [“(the Administrative Code) require(s), for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law”].) In addition, “egregious misconduct is evidence of the requisite mental state.” (Kolstad v American Dental Assn., 527 US at 535.)
“[W]hile consideration of claims brought under the New York City Human Rights Law parallels the analysis used in Title VII claims, see [Cruz v Coach Stores, Inc., 202 F3d 560, 565 n 1 (2000)], the analysis under federal anti-discrimination laws [however,] cannot be used in those cases where the statutes differ. See, e.g., Reeves v. Johnson Controls World Services, Inc., 140 F3d 144, 154-56 (2d Cir.1998).” (Thompson v American Eagle Airlines, Inc., 2000 WL 1505972, *11, 2000 US Dist LEXIS 14932, *32-33 [SD NY, Oct. 6, 2000].)
Thus, although in the federal context, “an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer’s ‘good-faith efforts to comply with Title VII’ ” (Kolstad v American Dental Assn., 527 US at 545), “the New York City Human Rights Law has made good faith compliance procedures only a factor to be considered in mitigation of punitive damages, rather than a complete defense.” (Thompson v American Eagle Airlines, Inc., 2000 WL 1505972, *11, 2000 US Dist LEXIS 14932, *33 [2000]; Administrative Code § 8-107 [13] [e].)
*778 These safe harbor provisions allow an employer to plead and prove various factors where liability for discriminatory conduct is based “solely on the conduct of an employee, agent, or independent contractor.” (§ 8-107 [13] [d].) Among the factors that can be pleaded is a “meaningful and responsive procedure for investigating complaints” and a “firm policy against such practices which is effectively communicated.” (See Administrative Code § 8-107 [13] [d] [1] [i], [ii].) An employer, however, cannot mitigate damages simply by having a responsive procedure in writing. As the statute clearly and logically states, the procedure must be “meaningful.”
Here, there was ample evidence before the jury to find that defendant had engaged in discrimination and done so with “malice or reckless indifference” to plaintiffs protected rights. Perhaps the most significant piece of evidence in this regard is that although defendant had a nondiscriminatory policy in place, Bennett, the EEC compliance officer in this large and sophisticated national corporation, took no steps to discipline or otherwise counsel two supervisory personnel (one of whom plaintiff testified was Fidoten) whom he heard call plaintiff a “cripple.” Given Bennett’s inaction, simply promulgating anti-discrimination policies and having them inserted in the company’s policy book cannot serve as a mitigating factor. To be sure, while these safe harbor provisions clearly provide an employer with an incentive to mitigate damages, the provisions are meant to be used by an employer as a weapon to eliminate, or at the very least, reduce discriminatory practices, not as a means of avoiding financial consequence and accountability. Accordingly, defendant’s motion for remittitur of damages is denied.
Plaintiffs Motion for Attorney’s Fees
Plaintiff moves for costs and reasonable attorney’s fees pursuant to section 8-502 (f) of the Administrative Code of the City of New York, which provides that “[i]n any civil action commenced pursuant to this section, the court, in its discretion, may award the prevailing party costs and reasonable attorney’s fees.” In Hensley v Eckerhart (461 US 424, 433 [1983]), the Supreme Court stated that “succe[ss] on any significant issue in litigation that achieves some of the benefit sought” is sufficient to qualify a party as a prevailing party for the purposes of determining an award of attorney’s fees. Here, plaintiff is clearly a prevailing party. Accordingly, this court will conduct an attorney’s fees hearing to determine an appropriate award. The *779 court will be guided by the factors listed in McGrath v Toys “R” Us, Inc. (3 NY3d 421, 429 n 1 [2004]) in making its determination. These factors include: the degree of success; the time and labor required; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the preclusion of other legal work resulting from the acceptance of this case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the experience, reputation and ability of the attorneys; the “undesirability” of the case; the nature and length of the professional relationship with the client; and awards in similar cases. (Id.)
Accordingly, it is ordered that defendant’s motion for judgment notwithstanding the verdict, a new trial and remittitur is denied in its entirety.
[Portions of opinion omitted for purposes of publication.]

. (Remarks by former Mayor David N. Dinkins at a public hearing on Local Laws of the City of New York, June 18, 1991, at 1-2 [on file with Committee on General Welfare].) As former Mayor Dinkins noted, it was “the intention of the Council that judges interpreting the City’s Human Rights Law . . . not... be bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed.” (Id. at 1; see also Local Law No. 85 [2005] of City of NY § 1 [Local Civil Rights Restoration Act of 2005] “[It is the sense of the Council that New York City’s Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City’s Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes. Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor *771 below which the City’s Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise”].)

. An employer cannot terminate an employee because of the preferences of third parties that violate the laws of New York. (Matter of American Jewish Congress v Carter, 23 Misc 2d 446 [Sup Ct, NY County 1959], mod 10 AD2d 833 [1st Dept 1960], affd 9 NY2d 223 [1961]; see also Sprogis v United Air Lines, Inc., 444 F2d 1194 [7th Cir 1971] [passenger preference for single airline stewardesses did not provide valid reason for invoking nonmarriage rule for stewardesses under exception in Civil Rights Act of 1964 title VII for bona fide occupational qualification]; Wigginess Inc. v Fruchtman, 482 F Supp 681, 692 [SD NY 1979], affd 628 F2d 1346 [2d Cir 1980].)

. AC&R requested a charge on “Deference to Business Judgment,” which essentially instructs the jury that an employer, based on its judgment, may discharge an employee for any reason as long as it is not discriminatory. It also requested a charge on “Same Actor Inference,” which states that “when the individual who hires a person is the same person who terminates an employee, there is a strong inference that discrimination did not motivate the termination decision.” The court declined the request because its charge on employment discrimination adequately conveyed all the relevant principles.

. During Fidoten’s direct testimony, he testified that he received a complaint from Foot Locker that plaintiff’s work was too complex, and occasionally, too expensive. During cross-examination, plaintiff wanted to ask Fidoten about a statement allegedly made by a Foot Locker representative to plaintiff that Foot Locker had never made such a complaint, but the court denied plaintiffs request on hearsay grounds. Plaintiffs efforts to nonetheless ask Fidoten about that conversation between a Foot Locker representative and plaintiff were sustained. (See trial transcript, Apr. 19, 2005, at 747-748, 750-751.)